1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL GONZALES, | Case No. 1:15-cv-0924-DAD-SKO (PC) |
| Plaintiff, | **FINDINGS AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMMARY JUDGMENT** |
| v. | |
| PODSAKOFF, et al., | (Doc. 101) |
| Defendants. | OBJECTIONS DUE WITHIN 21 DAYS |

## <u>INTRODUCTION</u>

Plaintiff, Michael Gonzales, is a state prisoner proceeding *pro se* and *in forma pauperis* filed this civil rights action pursuant to 42 U.S.C. § 1984. Defendants have filed a motion for summary judgment, contending that Plaintiff cannot establish a triable issue of fact on the merits of his claims against them. Fed. R. Civ. P.[1] 56(c). Plaintiff filed an opposition.[2] (Doc. 104.) Defendants filed their reply. (Doc. 108.) The motion is deemed submitted. L.R. 230(*l*). For the reasons discussed below, the Court finds that, Defendants' motion should be GRANTED.

---

[1] The Federal Rules of Civil Procedure will be referred to as "Rule *." Any reference to other statutory authorities shall so indicate.

[2] Plaintiff was provided with contemporaneous notice of the requirements for opposing a summary judgment motion for failure to exhaust administrative remedies with Defendants' moving papers as well as separate order from this Court. *Stratton v. Buck*, 697 F.3d 1004, 1008 (9th Cir. 2012); *Woods v. Carey*, 684 F.3d 934, 939-41 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 960-61 (9th Cir. 1998). (Docs. 101, 102.)

1

# SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1422, 1436 (9th Cir. 1987). The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a *pro se* prisoner. *Thomas v. Ponder*, 611 F3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F.Supp.2d 1192, 1200 (S.D. Cal. 1998).

Each party's position must be supported by (1) citing to specific materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist*., 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo County, Ariz.,* 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and, in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. *In re Oracle Corp.*

*Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp.,* 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless Inc.,* 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), *cert. denied*, 132 S.Ct. 1566 (2012). The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a *pro se* prisoner. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

## FINDINGS

### A. Plaintiff's Claims

This action proceeds on Plaintiff's First Amended Complaint ("FAC") (Doc. 26) on claims under the Due Process Clause and Eighth Amendment against Defendants A. Podsakoff, L. Lawrence, B. Stringer, J. Medina, J. Juarez, R. Mendoza, and Nurse Gonzales. (Doc. 28.) Plaintiff's claims are based on allegations that he was previously subject to a *Keyhea* order and received antipsychotic medications which were discontinued because he experienced a number of

negative side effects.  He alleges that between August 13, 2015 and April 4, 2016, at California State Prison ("CSP-Cor"), in Corcoran, California, Defendant Nurse Gonzales provided antipsychotic medication that Defendants A. Podsakoff, L. Lawrence, B. Stringer, J. Medina, J. Juarez, and R. Mendoza used to surreptitiously taint his food.  Plaintiff sets forth specific dates on which these Defendants tainted his food and describes the adverse effects he allegedly experienced. Plaintiff also alleges that J. Medina, J. Juarez, and R. Mendoza denied him meals on various dates so that he would be hungry and eat the next meal he received which was heavily medicated.  These allegations were found to state a cognizable claim against Defendants A. Podsakoff, L. Lawrence, B. Stringer, J. Medina, J. Juarez, R. Mendoza, and Nurse Gonzales for involuntarily medicating Plaintiff without a *Keyeha* order in violation of his due process rights and in violation of his rights under the Eighth Amendment.  (Doc. 28.)

### B.  Legal Standards

#### 1. Involuntary Antipsychotic Medication

Prisoners have a substantial liberty interest, grounded in the Due Process Clause, in avoiding the involuntary administration of antipsychotic medication.  *Washington v. Harper*, 494 U.S. 210, 229 (1990).  Although prisoners may be involuntarily medicated if they are a danger to themselves or others and the treatment is in their best medical interest, they must be provided with procedural protections to ensure that the decision to medicate them involuntarily is not arbitrary or erroneous.  *Harper*, 494 U.S. at 227-28.  In *Keyhea v. Rushen*, 178 Cal.App.3d 526, 542 (Cal. Ct. App. 1986), the California courts set forth the substantive and procedural safeguards which must be adhered to when the state seeks to involuntarily medicate state prisoners with long-term psychotropic medications.  Such courts orders are commonly known as *Keyhea* orders.  Giving inmates psychotropic medications without following these requirements violates their rights under the Due Process Clause.

#### 2. Eighth Amendment

"The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

Adequate food is a basic human need protected by the Eighth Amendment. *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982), (abrogated on other grounds by *Sandin v. O'Connor*, 515 U.S. 472 (1995)). While prison food need not be "tasty or aesthetically pleasing," it must be "adequate to maintain health." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993). However, extreme deprivations are required to make out a conditions of confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citations and quotations omitted). To establish a violation of the Eighth Amendment, Plaintiff must submit evidence sufficient to show that prison officials knew of and disregarded a substantial risk of serious harm to the plaintiff. *Farmer*, 511 U.S. at 847.

## C. __Defendants' Motion__[3]

Defendants contend that for over twenty years, Plaintiff believes staff at each California Department of Corrections and Rehabilitation ("CDCR") institution where he was housed tampered with his food by illegally medicating it. Plaintiff now believes other inmates have begun tampering with his food at his current institution. Defendants contend that although Plaintiff has filed numerous lawsuits regarding this issue, he has never been successful because his claims are untrue and implausible. In this action, Plaintiff alleges a psychiatric technician gave six correctional officers Thorazine, Cogentin, Haldol, and Vistaril (in white powdered form), to put into his food while he was housed in CSP-Cor's Security Housing Unit (SHU) in 2015 and 2016.

Defendants contend that Plaintiff has no evidence to support his allegations. They contend that none of the medications identified by Plaintiff existed in a white powder format, the psychiatric technician did not pass medications to the correctional officers, the correctional officers did not prepare food for the inmates or have access to medications, medications and meals were generally distributed at different times, and Plaintiff's complaints of a throat-burning sensation can be attributed to his history of gastroesophageal reflux disease (GERD).

---

[3] Disputes of fact shown by Plaintiff's evidence are delineated in the discussion of his opposition.

Additionally, Defendants seek summary judgment on Plaintiff's claim for damages against the Defendants in their official capacity since they are barred by the Eleventh Amendment.

### 1. Defendants' Undisputed Facts[4]

#### a. Food Tampering

According to Defendants' evidence, Plaintiff first believed staff at CSP-Cor were tampering with his food in 1998. (DUF No. 11.) Plaintiff has filed at least ten lawsuits alleging food tampering by staff and has never prevailed.[5] (DUF No. 28.) Plaintiff believes staff at CSP-Cor were tampering with his food "when the food started burning [his] mouth and making [him] sick." (DUF No. 12.) Plaintiff alleges the food tampering has "never stopped." (DUF No. 13.) Although he is no longer at CSP-Cor, Plaintiff believes inmates at his current institution are tampering with his food. (DUF No. 24.)

In this action, Plaintiff believes Defendants tampered with his food by tainting it with Vistaril, Thorazine, Haldol, and Cogentin. (DUF No. 14.) Plaintiff alleges the correctional officers would get medication from other inmates or nurses—specifically Psychiatric Technician Gonsalves—to put into his food. (DUF Nos. 19, 76.) In his First Amended Complaint, Plaintiff listed specific dates each Defendant allegedly medicated his food. (*See* ECF No. 22 at 8:22-9:3.) During his deposition, however, Plaintiff alleged that Defendants medicated his food "every day." (DUF No. 15.) Plaintiff alleged one of the Defendants medicated his food "just by looking at" it. (DUF No. 101.) Plaintiff believes Haldol was used because he knows "exactly what it does" because he took it in 1996, and it burned his throat. (DUF Nos. 16, 17.) Plaintiff also alleges he was being medicated with Thorazine because it burns his throat. (DUF No. 18.) Plaintiff alleges the medications placed into his food were a white powder, (DUF No. 20), which "comes like that" or had been crushed by another inmate or the officer passing it out.

When Plaintiff ate the allegedly tainted food, his tongue would get numb, his muscles would twitch, and his leg would convulse. (DUF No. 22.) Plaintiff has had blood tests while he

---

[4] "DUF" refers to Defendants' Statement of Undisputed Facts.
[5] These cases are summarized in Defendants' motion for an order requiring security. (*See* Defs.' Mem. Ps&As Supp. Mot. for Order Requiring Security, ECF No. 49-1 at 17-21.)

has been in prison, which have not revealed any abnormality. (DUF No. 47.) Plaintiff believes photos from his recent esophagogastroduodenoscopy ("EGD") are evidence that staff tampered with his food. (DUF No. 24.) Plaintiff cannot identify any inmates that witnessed the alleged food tampering by staff, (DUF No. 25), or any of the inmates whose medications were allegedly used by staff to medicate him, (DUF No. 26.)

### b. The Medications Allegedly Placed in Plaintiff's Food

At all times relevant to this lawsuit, Plaintiff was not prescribed medication that needed to be administered by a psychiatric technician, nurse, or doctor, such as anti-psychotic medications. (DUF No. 44.) Plaintiff did not receive medication involuntarily in accordance with California Penal Code Section 2602. (DUF No. 45.) Plaintiff received and signed for medication that was designated "Keep-on-Person" or KOP, which means that the medication could be safely administered by the patient to himself, and kept in his cell. (DUF No. 46.) This included Mintox, which controls heartburn, sour stomach, indigestion, and other such indications. (*Id.*)

Plaintiff alleges that the Defendants specifically placed Vistaril, Thorazine, Haldol, and Cogentin in his food. (DUF No. 14.) From March 1, 2015, through April 5, 2016, the CSP-Cor pharmacy purchased Vistaril, Haldol, Thorazine, and Cogentin from AmerisourceBergen, which is an American drug wholesale company that contracts with CDCR. (DUF No. 61.) All medication orders issued by CSP-Cor medical staff for inmates housed at CSP-Cor were processed and dispensed solely through the pharmacy at CSP-Cor. (DUF No. 62.) No orders for Vistaril, Haldol, Thorazine, or Cogentin were received, processed, or dispensed for Plaintiff from the CSP-Cor pharmacy between March 1, 2015, and April 5, 2016. (DUF No. 63.)

Vistaril, or hydroxyzine pamoate, is a prescription antihistamine drug used to treat allergic reactions, anxiety, tension, nausea, vomiting, alcohol withdrawal, and other conditions. (DUF No. 64.) During the relevant time-period, CSP-Cor purchased and received this drug in green, pink and yellow, red and yellow, or green and white oblong capsules. (*Id.*) The powder inside the capsule was either a light yellow or yellow. (*Id.*) Common adverse reactions to Vistaril include dry mouth, drowsiness, dizziness, weakness, slurred speech, headache, agitation, bitter taste, loss of voluntary muscle movement, and nausea. (DUF No. 65.) Serious adverse reactions

to Vistaril include hypersensitivity, seizures, heat stroke, shortness of breath, and abnormal heart rhythm. (*Id.*)

Haldol, or haloperidol, is an antipsychotic medication used in the treatment of schizophrenia, Tourette's syndrome, and other similar conditions. (DUF No. 66.) During the relevant time-period, CSP-Cor purchased and received this drug in small orange, yellow, pink or green round or oblong tablets, yellow to light amber liquid, or a clear liquid form. (*Id.*) Common adverse reactions to Haldol include insomnia, anxiety, drowsiness, lethargy, weight changes, photosensitivity, involuntary movements, swelling of breast tissues, menstrual irregularities, milk secretion from the breast, photosensitivity, and impaired body temperature regulation. (DUF No. 67.) Serious adverse reactions to Haldol include serious involuntary moments or spasms, heat strike, pneumonia, low blood pressure, dry mouth, sudden death, seizures, hepatic impairment, blood cell deficiencies, cataracts, retinopathy, and abnormal heart rhythm. (*Id.*)

Thorazine, or chlorpromazine, is an antipsychotic medication used to treat schizophrenia and other conditions. (DUF No. 68.) During the relevant time-period, CSP-Cor purchased and received this drug in small round, brown coated tablets or a clear liquid form. (*Id.*) Common adverse reactions to Thorazine include drowsiness, low blood pressure, blurred vision, dry mouth, constipation, urinary retention, nausea, nasal congestion, agitation, insomnia, involuntary movements, high levels of prolactin, sexual dysfunction, weight gain, high levels of fat in blood, ocular pigmentation, skin pigmentation, jaundice, photosensitivity, and impaired body temperature regulation. (DUF No. 69.) Serious adverse reactions to Thorazine include involuntary body movements, neuroleptic malignant syndrome, blood disorders, blood cell deficiencies, low blood pressure, prolonged erection, seizures, hypersensitivity, abnormal heart rhythm, allergic reaction, dermatitis, and heat stroke. (*Id.*) Cogentin, or benztropine mesylate, is used to treat Parkinson's disease or involuntary movements due to the side effects of certain psychiatric drugs such as Thorzaine or Haldol, and other conditions. (DUF No. 70.) During the relevant time-period, CSP-Cor purchased and received this drug in small, white round or oblong tablets, or a clear liquid form. (*Id.*) Common adverse reactions to Cogentin include constipation, urinary retention, dry mouth, sedation, fast heartbeat, shortness of breath, itching, nausea,

vomiting, flatulence, anorexia, abdominal pain, rash, dizziness, headache, nervousness, ear ringing, swollen limbs, and blurred vision. (DUF No. 71.) Serious adverse reactions to Cogentin include abnormal heart rhythm, psychosis, and heat stroke. (*Id.*)

None of those four drugs existed or were administered in a white powder format at CSP-Cor. (DUF No. 72.) If the tablets were ordered by medical staff to be crushed before administering them, the psychiatric technician or nurse would crush the medication using a specialized machine kept under his or her control and custody. (DUF No. 73.) All of these four drugs were solely handled and administered by medical staff, including psychiatric technicians or nurses. (DUF No. 74.) When Dr. Gill, a physician and surgeon that worked in Plaintiff's housing facility during the relevant time-period, encountered Plaintiff, Plaintiff did not complain of the common and severe adverse reactions attributed to Vistaril, Haldol, Thorazine, and Cogentin, and Dr. Gill did not observe any of these reactions when he evaluated Plaintiff. (DUF No. 75.)

### c. Plaintiff's History of Gastroesophageal Reflux Disease ("GERD")

Plaintiff has a history of GERD. (DUF No. 48.) GERD is a digestive disorder that affects the lower esophageal sphincter, which is the ring of muscle between the esophagus and stomach. (DUF No. 49.) The most common symptom of GERD is heartburn or acid indigestion which feels like a burning chest pain beginning behind the breastbone and moving upward to the neck and throat. (*Id.*)

On June 22, 2017, Plaintiff received an esophagogastroduodenoscopy ("EGD"), which is a diagnostic minimally invasive endoscopic procedure that visualizes the upper part of the gastrointestinal tract down to the duodenum. (DUF No. 50.) The EGD results showed that Plaintiff had mild esophagitis, which is an inflammation of the lining of the esophagus. (DUF No. 51.) Irritation leading to esophagitis may be caused by GERD. (DUF No. 52.) The EGD showed that Plaintiff had mild esophagitis, which is consistent with his history of GERD. (DUF No. 53.) The EGD did not show that Plaintiff ingested Vistaril, Haldol, Thorazine, and Cogentin or that his food was tampered with these medications. (DUF No. 54.) Neither esophagitis nor GERD are correlated with ingesting Vistaril, Cogentin, Thorazine, or Haldol. (DUF No. 55.)

#### d. Distribution of Meals at CSP-Cor

At all times relevant to Plaintiff's allegations, Plaintiff was housed in Facility 4A, which was a Security Housing Unit (SHU) that generally housed level-four maximum custody inmates. (DUF No. 29.)  The meals at CSP-Cor were prepared in the kitchen, which was an entirely separate facility from Plaintiff's housing facility.  (DUF No. 30.)  The food was delivered to Facility 4A in large trays.  (DUF No. 31.)  Custodial staff portioned the food onto individual meal trays using pre-measured utensils.  (DUF No. 32.)  The trays were then stacked in a large cart and delivered to the inmates.  (DUF No. 33.)  Nothing other than food was put on the trays.  (DUF No. 34.)  When staff delivered the meals, the meals did not have Plaintiff's name on it—they were "just stacked" on a cart.  (DUF No. 35.)  Because meals were randomly stacked on the meal trays, there was no way to know with certainty which inmate would get a specific meal tray. (DUF No. 36.)

#### e. Distribution of Medication at CSP-Cor

Only medical staff dispensed medication to inmates that were prescribed medication via a physician's order.  (DUF No. 40.)  Correctional staff did not handle the medication or administer it to the inmate.  (DUF No. 43.)  Correctional staff escorted the medical staff during the administration of medication for inmates in Facility 4A solely for security purposes to open and close food ports in accordance with CDCR policy.  (DUF No. 38.)  In the rare instance the officers distributing food and the officer escorting the medical staff distributing medication arrived at the same cell at the same time, one group would yield to the other group and return to the inmate's cell after the food or medication was distributed.  (DUF No. 39.)  Medications were generally not distributed at the same time as meals.  (DUF No. 37.)

Regarding this case, when Psychiatric Technician Gonsalves arrived for her shift, she would check out the key for the medication cart from the complex control officer.  (DUF No. 78.) She would present her state identification card to the officer and give the officer a chit, or token, with her name on it.  (*Id.*)  The officer would place her chit on a particular key hook and give her the key.  (*Id.*)  When she returned the key at the end of her shift, she would get her chit back. (*Id.*)  The medication cart was kept locked and stored in Gonsalves' office located in Facility 4A

at all times, except when she was administering medication.  (DUF No. 79.)  Correctional staff did not have access to the medication cart or any of the medications.  (DUF No. 41.)  When not in use, the key to the medication cart was kept in complex control, which is a separate building from Facility 4A.  (DUF No. 42.)  Gonsalves would stock the medication cart with medications which were delivered to her by pharmacy staff in accordance with doctors' orders.  (DUF No. 80.)

Because Facility 4A was a designated SHU, Gonsalves would administer medication at each inmate's locked cell door.  (DUF No. 81.)  Prior to administering medication, Gonsalves would review the narcotic binder for any new narcotic orders, and document the inmate-patient's name, drug, and dose in the narcotic log book.  (DUF No. 80.)  Gonsalves would also check each inmate's Medication Administration Record (MAR) for potential allergies, document verification on the MAR that it had been reconciled with the prescriber's orders, verify the medication order had not expired, and verify the medication itself had not expired.  (DUF No. 82.)  Gonsalves would instruct the inmate-patient to turn on the light and come to the front of the cell in clear visibility of the window, and bring his state-issued cup filled with water to swallow oral medications if necessary.  (DUF No. 83.)  Gonsalves would then ensure that she was administering the correct medication to the correct patient, and that she was giving each patient the right dose, through the right route, at the right time.  (DUF No. 84.)  Once custody staff opened the food port, Gonsalves would place the inmate-patient's medication on the opened food port.  (DUF No. 85.)

Once Gonsalves administered the medication, she would ensure the inmate received the medication.  (DUF No. 86.)  If the medication needed to be swallowed, she made sure the inmate swallowed the medication by having him show her the inside of his mouth.  (*Id.*)  If necessary, she would have custody staff open the cell door to allow her to observe the inmate ingest the medication.  (*Id.*)  Gonsalves would then document on the MAR that the medication was administered to the inmate.  (DUF No. 87.)  If an inmate refused medication, Gonsalves would document his refusal on the MAR in accordance with CDCR policy.  (DUF No. 88.)  Gonsalves would repeat these procedures with each inmate that needed medication that day until every inmate received their medication.  (DUF No. 89.)  If Gonsalves saw custody staff administering

medication to an inmate, she would report it to her supervisor and that staff person's supervisor. (DUF No. 96.)

## 2. Defendants' Arguments

### a. Plaintiff's Claim of Medicated Food

Defendants contend that Plaintiff's allegations that Defendants tampered with his food are not supported by anything more than Plaintiff's conclusory statements and his own interpretation of his medical records, which has been refuted by a medical doctor. (DUF No. 54.) Defendants contend that, by his own testimony, Plaintiff demonstrates that the factual context of his claims are implausible. Plaintiff's entire lawsuit is premised on his claim that Gonsalves or other inmates gave Podsakoff, Medina, Mendoza, Stringer, Lawrence, and Juarez Thorazine, Haldol, Vistaril, or Cogentin to medicate Plaintiff. (DUF Nos. 14, 76.) The officers then allegedly placed the medication—in the form of a white powder—onto Plaintiff's food. (DUF Nos. 19-21.) Upon eating the medicated food, Plaintiff alleges his throat would burn, his tongue would get numb, his muscles would twitch, and his leg would convulse. (DUF Nos. 12, 17, 18, 22.) Plaintiff identified specific dates in his First Amended Complaint that the food tampering allegedly occurred, and then stated in his deposition that it happened every single day. (DUF No. 15; FAC, ECF. No 22 at 8:22-9:3.) Defendants contend that, even viewing the evidence in the light most favorable to Plaintiff, several undisputed facts show that Plaintiff's allegations are fictitious.

First, Defendants have established that none of the four medications identified by Plaintiff existed in a white powder format. (DUF No. 72.) While the Cogentin tablets could have theoretically been crushed into a white powder since Corcoran purchased and received this drug in round or oblong white tablets, only medical staff had access to the specialized machine that could crush the medication into a powder. (DUF Nos. 70, 73.) The Haldol, Vistaril, and Thorazine were not purchased in a format that could have been crushed into a white powder. (DUF Nos. 64, 66, 68.) Correctional staff did not receive any medications, much less white powder, from Gonsalves, medical staff, or other inmates. (DUF Nos. 58-60.)

Second, Defendants correctly state that the evidence shows that Plaintiff's chief complaint of a throat-burning sensation is attributable to his long history of GERD, rather than food

tampering.  (ECF No. 48.)  A throat-burning sensation is not a recognized reaction attributed to any of the four medications, but it is a common symptom of GERD.  (*See* DUF Nos. 49, 65, 67, 69, 71.)  Contrary to Plaintiff's belief, the 2017 EGD results did not show that Plaintiff ingested Visatril, Cogentin, Thorazine, or Haldol.  (DUF No. 54.)  Instead, the EGD results showed Plaintiff has mild esophagitis, which explains why he experiences a throat-burning sensation after eating food.  (DUF Nos. 49, 53.)  Significantly, Plaintiff did not have any symptoms consistent with exposure to these medications when he was evaluated by Dr. Gill.  (DUF No. 75.)

Third, Defendants' evidence establishes that correctional staff did not prepare food for the inmates, they did not have access to medications or the medication cart, and there was no way to know with certainty which inmate would get a specific food tray.  (DUF Nos. 30, 36, 41, 57.)  Fourth, medication and meals were generally distributed at different times.  (DUF No. 37.)  Fifth, Plaintiff alleges Medina, Mendoza, Juarez, and Stringer medicated his food on days they were not working in Plaintiff's housing facility, and even alleges Podsakoff was able to medicate him just by "looking" at him.  (DUF Nos. 101, 110, 116, 125, 130.)  Finally, Plaintiff could not identify the inmates who allegedly gave officers medication to administer to Plaintiff or who witnessed the food tampering.  (DUF Nos. 25, 26.)

### b. Plaintiff's Claim of Food Tampering

### (1) Defendant Gonsalves

There is no evidence that Gonsalves gave correctional staff medications to administer to Plaintiff.  In fact, correctional staff did not have access to the medication cart or any of the medications.  (DUF No. 41.)  Gonsalves has never given and would never give custody staff medications to administer to an inmate.  (DUF No. 95.)  Gonsalves has never tampered and would never tamper with inmates' medications.  (DUF No. 92.)  Gonsalves has never administered and would never administer medication to an inmate that was not prescribed medication by a medical doctor.  (DUF No. 93.)  Gonsalves has never allowed and would never allow custody staff access to the medications to be administered to inmates.  (DUF No. 94.)  If Gonsalves saw custody staff administer medication to an inmate, she would report it to her supervisor and that staff person's supervisor.  (DUF No. 96.)

On a few occasions, Gonsalves responded to Plaintiff's health care services request forms for a refill of his Mintox tablets, and she refilled his prescription pursuant to doctors' orders. (DUF No. 90.) Apart from delivering Plaintiff his KOP medication, Gonsalves rarely had contact with Plaintiff. (DUF No 91.) She would only stop at Plaintiff's cell with the medication cart on the days she needed to deliver him his KOP medication. (*Id.*) The Court finds Defendants have met their burden of proving an absence of evidence to support Plaintiff's claim against Defendant Gonsalves. *In re Oracle Corp.*, 627 F.3d at 387.

### (2) Officer Podsakoff

Plaintiff alleges Podsakoff medicated his food on certain days including on May 7, 2015, May 12, 2015, May 14, 2015, May 19, 2015, and May 26, 2015. (DUF No. 97.) During his deposition, however, Plaintiff alleged Podsakoff would tamper with his food "every single day." (DUF No. 98.) Plaintiff also alleges he was placed on a *Keyhea* order in 1996 because of Podsakoff. (DUF No. 99.) Plaintiff alleges Podsakoff would medicate Plaintiff's food "just by looking at you." (DUF No. 101.) Plaintiff claims Podsakoff would medicate him by putting "little packets of the powder" in the tray in front of him. (DUF No. 102.) Podsakoff did not say anything to him when he tampered with his food. (DUF No. 103.) Podsakoff would talk to the inmates from whom he got the medication and say, "We got him." (DUF No. 104.)

Defendants' evidence establishes Podsakoff did not begin his employment with CDCR until 2007; thus Plaintiff's allegation that he was placed on a *Keyhea* order *because of* Podsakoff is incorrect. (DUF No. 100.) Plaintiff also could not identify those inmates from whom Podsakoff allegedly got medication to administer to Plaintiff. (DUF No. 104.) Plaintiff also alleges Podsakoff would medicate other inmates in other cells, but could not identify any such inmates. (DUF No. 105.) Defendants' evidence shows Podsakoff never tampered with or medicated any of Plaintiff's meals, (DUF No. 56), had no involvement with preparing inmates' food, (DUF No. 57), had no access to medications, (DUF No. 58), and never administered medication to Plaintiff, (DUF No. 59). And neither medical staff nor inmates ever passed medication to Podsakoff to administer to Plaintiff. (DUF No. 60.) Finally, the four medications Plaintiff identified as having been placed in his food—Haldol, Thorazine, Cogentin, and

Vistaril—do not exist, and are not administered, in a powder format. (DUF Nos. 14, 72.) If medication ordered by medical staff needed to be crushed, a medical staff person would crush the medication using a specialized machine kept under his or her control and custody. (DUF No. 73.)

Based on the foregoing, there is no evidence to support Plaintiff's allegations and his allegations are refuted by Podsakoff's evidence. The Court finds Defendants meet the burden of proving an absence of evidence to support Plaintiff's claim against Officer Podsakoff. *In re Oracle Corp.*, 627 F.3d at 387.

### (3) Officer Medina

Plaintiff alleged Medina medicated his food between March 24, 2015, and March 31, 2015, and on May 3, 2015 and May 4, 2015, at Corcoran. (DUF No. 106.) During his deposition, Plaintiff alleged Medina would tamper with his food "every day he was working." (DUF No. 107.) Plaintiff alleged Medina would give him the tray that was medicated, or get medications from other inmates or the nurse, to put in his food. (DUF No. 108.) Plaintiff alleged Medina would pour the white powder on top of his food. (DUF No. 109.)

Defendants' evidence shows Medina did not work in Plaintiff's housing unit on March 24, March 26, and March 27, 2015; therefore any allegations pertaining to those days are untrue. (DUF No. 110.) Medina has never tampered with or medicated any of Plaintiff's meals. (DUF No. 56.) Medina also had no involvement in preparing food, (DUF No. 57), had no access to medications, (DUF No. 58), and never administered medication to Plaintiff. (DUF No. 59.) Neither medical staff nor inmates ever passed medication to Medina to administer to Plaintiff. (DUF No. 60.) As explained above, the four medications Plaintiff identified as having been placed into his food—Haldol, Thorazine, Cogentin, and Vistaril—also do not exist, and are not administered, in a powder format. (DUF Nos. 14, 72.) If the medication ordered by medical staff needed to be crushed, a medical staff person would crush the medication using a specialized machine kept under his or her control and custody. (DUF No. 73.)

In sum, there is no evidence to support Plaintiff's allegations against Medina and the allegations are refuted by Medina's evidence. The Court finds Defendants meet the burden of proving an absence of evidence to support Plaintiff's claim against Officer Medina. *In re Oracle*

*Corp.*, 627 F.3d at 387.

### (4) Officer Mendoza

In his First Amended Complaint, Plaintiff alleged Mendoza medicated his food from March 24, 2015, to March 31, 2015, and on May 26, 2015. (DUF No. 112.) During his deposition, Plaintiff alleged Mendoza medicated his food "ever since he worked there." (DUF No. 113.) Plaintiff alleged he would see Mendoza "put in the same powder" into his food. (DUF No. 114.) Plaintiff alleged Mendoza would medicate other inmates in other cells, but he could not identify those inmates. (DUF No. 115.)

Defendants' evidence shows Mendoza did not work in Facility 4A on any of the dates listed in Plaintiff's First Amended Complaint; therefore the allegations against Mendoza in the First Amended Complaint are untrue. (DUF No. 116.) Mendoza worked intermittently on Facility 4A depending on where he was assigned as a relief officer; he worked on Facility 4A1R, which is where Plaintiff was housed at all times relevant to his claims in this action. (DUF No. 117.) Mendoza has never tampered with or medicated any of Plaintiff's meals. (DUF No. 56.) Mendoza had no involvement with preparing food, (DUF No. 57), had no access to medications, (DUF No. 58), and never administered medication to Plaintiff, (DUF No. 59). Neither medical staff nor inmates ever passed medication to Mendoza to administer to Plaintiff. (DUF No. 60.)

Additionally, as set forth above, none of the medications Plaintiff identifies as having been placed in his food existed or were administered in a "powder" format. (DUF Nos. 14, 72.) Plaintiff has no evidence to support his claims against Mendoza, and his allegations are refuted by Mendoza's evidence. The Court finds Defendants meet the burden of proving an absence of evidence to support Plaintiff's claim against Officer Mendoza. *In re Oracle Corp.*, 627 F.3d at 387.

### (5) Officer Lawrence

In his First Amended Complaint, Plaintiff alleges Lawrence tampered with his food by putting medication in it on May 25, 2015 and May 26, 2015. (DUF No. 119.) During his deposition, Plaintiff stated Lawrence would tamper with his food "all the time he worked there." (DUF No. 120.) Plaintiff alleged Lawrence would "make sure" Plaintiff's food was medicated

16

with "either Thorazine or Cogentin, Vistaril." (DUF No. 121.)

Plaintiff's allegations regarding Lawrence are not only unsupported by evidence, they are also implausible because Lawrence had no involvement with preparing food, no access to medications, and never administered medication to Plaintiff. (DUF Nos. 57, 58, 59.) And neither medical staff nor inmates ever passed medication to Lawrence to administer to Plaintiff. (DUF No. 60.) Lawrence has never tampered with or medicated any of Plaintiff's meals. (DUF No. 56.)

Plaintiff has no evidence to support his claims against Lawrence, and his allegations are refuted by Lawrence's evidence. The Court finds Defendants meet the burden of proving an absence of evidence to support Plaintiff's claim against Officer Lawrence. *In re Oracle Corp.*, 627 F.3d at 387.

### (6) Officer Juarez

In his First Amended Complaint, Plaintiff alleges Juarez tampered with his food by placing medication in his meals on March 14, 2015, March 20, 2015, and from March 24, 2015, to March 31, 2015. (DUF No. 122.) During his deposition, Plaintiff stated Juarez would tamper with his food "all the time." (DUF No. 123.) Plaintiff alleged Juarez tampered with his food "the same way the other COs did." (DUF No. 124.) He would put the medication in the food or get it from the nurse, or give him a tray he knew was medicated. (*Id.*)

Plaintiff's allegations against Juarez are not supported by the evidence. On March 20, 2015, Juarez was working as a floor officer on Facility 3A. (DUF No. 125.) He did not work on March 24, 2015, March 30, 2015, and March 31, 2015—as those were his regular days off. (*Id.*) Therefore, Juarez had no interaction with Plaintiff on March 20, 2015, March 24, 2015, March 30, 2015, and March 31, 2015. (*Id.*) Juarez also has never tampered with or medicated any of Plaintiff's meals, (DUF No. 56), had no involvement in preparing food, (DUF No. 57), had no access to medications, (DUF No. 58), and never administered medication to Plaintiff, (DUF No. 59). Additionally, neither medical staff nor inmates ever passed medication to Juarez to administer to Plaintiff. (DUF No. 60.) Plaintiff alleges Juarez would tamper with his food "the same way the other COs did," but, as previously noted, the manner in which Plaintiff alleges

17

Defendants tampered with his food is implausible because the medications he identified did not exist in a powder format. (DUF Nos. 14, 72.) Correctional staff also did not have the access to the machine to crush medication. (DUF No. 73.)

The evidence establishes that Juarez did not tamper with Plaintiff's food, and Plaintiff's allegations are not only unsupported, but also implausible. The Court finds that Defendants have met their burden of proving an absence of evidence to support Plaintiff's claim against Officer Juarez. *In re Oracle Corp.*, 627 F.3d at 387.

### (7) Officer Stringer

In his First Amended Complaint, Plaintiff alleged Stringer medicated his food on March 14, 2015. (DUF No. 127.) During his deposition, Plaintiff stated Stringer tampered with his food "not every day, but most of the times he worked there." (DUF No. 128.) Plaintiff alleged he saw Stringer put medications in his food, and he tampered with his food "the same way the other COs did." (DUF No. 129.)

On March 14, 2015, Stringer did not work in Plaintiff's housing area. (DUF No. 130.) Stringer has never tampered with or medicated any of Plaintiff's meals, (DUF No. 56), had no involvement in preparing food, (DUF No. 57), had no access to medications, (DUF No. 58), and never administered medication to Plaintiff. (DUF No. 59.) Additionally, neither medical staff nor inmates ever passed medication to Stringer to administer to Plaintiff. (DUF No. 60.) Defendants have established that Stringer did not tamper with Plaintiff's food, and Plaintiff's allegations are not only unsupported, but implausible. The Court finds Defendants meet the burden of proving an absence of evidence to support Plaintiff's claim against Officer Stringer. *In re Oracle Corp.*, 627 F.3d at 387.

### c. Involuntary Medication Absent *Keyhea* order

Plaintiff claims Defendants violated his due process rights by surreptitiously placing medication into his food without a *Keyhea* order. However, Defendants did not tamper with or medicate Plaintiff's food. (DUF No. 56.) Plaintiff was not prescribed anti-psychotic medications during this time period, and the Corcoran pharmacy did not dispense anti-psychotic medications for him. (DUF Nos. 44, 45, 63.)

Defendants never administered medication to Plaintiff. (DUF Nos. 59, 93.) Plaintiff only received medication that was designated "Keep-on-Person," meaning it could safely be self-administered and kept in his cell. (DUF No. 46.) This included medication such as Mintox, which controls heartburn, sour stomach, indigestion, and other such indications. (*Id.*) Contrary to Plaintiff's allegations, Medina, Mendoza, and Juarez also never denied Plaintiff a meal so he would eat subsequent meals with medication. (DUF Nos. 111, 118, 126.) Defendants contend that because Plaintiff was not involuntarily medicated in any way by Defendants, there is no liberty interest at stake and no violation of Plaintiff's Fourteenth Amendment due process rights.

The Court finds Defendants have met their burden of proving an absence of evidence to support Plaintiff's claim for violation of his rights under the Due Process Clause for involuntarily medicating him without a *Keyhea* order. *In re Oracle Corp.*, 627 F.3d at 387.

### d. Immunity for Official Capacity Claims

Defendants contend that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. (Doc. 101-1, MSJ P&A, p. 21.) The Eleventh Amendment prohibits federal courts from hearing suits brought against an unconsenting state, *Brooks v. Sulphur Springs Valley Elec. Co.*, 951 F.2d 1050, 1053 (9th Cir. 1991) (citation omitted); *see also Seminole Tribe of Fla. v. Florida*, 116 S.Ct. 1114, 1122 (1996); *Puerto Rico Aqueduct Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993); *Austin v. State Indus. Ins. Sys.*, 939 F.2d 676, 677 (9th Cir. 1991), and "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and "[a]s such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Accordingly, "[t]he Eleventh Amendment bars actions for damages against state officials who are sued in their official capacities in federal court." *Dittman v. California*, 191 F.3d 1020, 1026 (9th Cir. 1999); *ref Kentucky v. Graham*, 473 U.S. 159, 169 (1985). "That is so because . . . a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents." *Id.* (citation and internal quotation marks omitted in original). Plaintiff's claims for monetary damages for alleged incidents that occurred at CSP-Cor against Defendants, who are state officials in their official capacities, are barred by the Eleventh

Amendment and should be dismissed.

Here, there is no evidence to support Plaintiff's claims and his allegations are contradicted by the evidence in the record. *Scott,* 550 U.S. at 380. Accordingly, Defendants have met their burden of demonstrating the absence of a genuine issue of material fact on Plaintiff's claims. The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of his contention that the dispute exists. Fed. R. Civ. P. 56(e); *Matsushita,* 475 U.S. at 586 n.11; *First Nat'l Bank,* 391 U.S. at 289; *Strong v. France,* 474 F.2d 747, 749 (9th Cir. 1973).

### D.    **Plaintiff's Opposition**

#### 1.    **Deferred Consideration Under Rule 56(d)**

Plaintiff states he "has had no access to law library or legal materials for approximately 9 months due to retaliation for the exercise of civil rights." (Doc. 104, p. 1.) He asserts that "The officers conduct files are still in question. Discovery hasn't occurred. Subpoenas of all Defendants. The doctors in question, who wrote medical files still need to be evaluated." (*Id.*, at p. 5.)

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). In seeking relief under Rule 56(d), Plaintiff bears the burden of specifically identifying relevant information, where there is some basis for believing that the information exists, and demonstrating that the evidence sought actually exists which would prevent summary judgment. *Blough v. Holland Realty, Inc.,* 574 F.3d 1084, 1091 n.5 (9th Cir. 2009) (quotation marks and citation omitted); *Getz v. Boeing Co.*, 654 F.3d 852, 867-68 (9th Cir. 2011); *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1100-01 (9th Cir. 2006). Plaintiff has made no such showing.

Discovery commenced in this case on June 27, 2018. (Doc. 84.) Plaintiff had

approximately eight months to conduct discovery before he filed his opposition. Plaintiff neither states what document/information he believes exists, nor demonstrates how it would prevent summary judgment to warrant deferred consideration of Defendants' motion. Plaintiff's bare statement that discovery "has not occurred" does not entitle him to relief under Rule 56(d). *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 1013 n.29 (9th Cir. 2013) (evidence to be sought through discovery must be based on more than mere speculation). Therefore, to the extent that Plaintiff's opposition might be construed as containing a motion to defer consideration of Defendants' motion for summary judgment under Rule 56(d), it should be denied.

### 2. Plaintiff's Exhibits

The Second Informational Order issued a few days after Defendants filed their motion. (*Compare* Doc. 101, with Doc. 102.) The Court informed Plaintiff of the requirements to oppose Defendants' motion, including the need to cite specific evidence to support the arguments raised in his opposition. (Doc. 102, p. 3.) Although Plaintiff submitted roughly 119 pages of exhibits, (*see* Doc. 104, pp. 6-124), he fails to cite to any specific evidence to support his allegations. Instead, he simply states that Defendants' motion should be denied and he should be allowed to proceed and asks the Court to "consider exhibits enclosed." (*Id.*, p. 5.) This does not comply with Local Rule 260(b).

The Court declines to expend its limited resources to ferret through more than one hundred pages of exhibits attempting to locate evidence which might oppose Defendants' motion where Plaintiff has failed to do so.

### 3. Plaintiff's Statements Under Penalty of Perjury

Plaintiff's argument (Doc. 104, pp. 1-5) and the FAC (Doc. 26) may be considered in opposition to Defendants' motion since Plaintiff signed both pleadings under penalty of perjury. A verified complaint in a *pro se* civil rights action may constitute an opposing affidavit for purposes of summary judgment, but only those statements which are based on an inmate's personal knowledge of admissible evidence, and not based simply on the inmate's belief, may be considered. *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); *Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e). Here, as discussed in detail

below, Plaintiff's allegations and opposition do not suffice to meet his burden of opposing

Defendants' motion since they appear to be entirely based merely on his belief or supposition and

not on admissible evidence.

Although Plaintiff's allegations in the FAC were found sufficient to state a cognizable

claim, the standard for screening allegations is far less stringent than the standard of proving a

triable issue of fact to defeat a motion for summary judgment.  On screening, Plaintiff's factual

allegations were accepted as true, leniently construed in his favor, and afforded the benefit of any

doubt.  *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).  In opposing Defendants' motion for

summary judgment, however, Plaintiff must designate specific facts and evidence which prove

his allegations and demonstrate the existence of a genuine issue for trial.  *In re Oracle Corp.,* 627

F.3d at 387.

In his opposition, Plaintiff makes numerous statements which are either too general and

conclusory to be accepted as evidence, or appear to seek to raise violations of his rights beyond

the scope of the pleadings in this action.  Plaintiff states he has been "in the security housing units

since 1990 and they have always medicated [his] meals as retaliation for the exercise" of his civil

rights, (Doc. 104, p. 1); that "the entire Pelican Bay State Prison was . . . found guilty of torture"

and that Plaintiff "was there being tortured from 1991 to 1998," (*id.*); that Plaintiff "was put

through the gladiator yards at Corcoran SHU" where "they fought [him] from 1990 to 1991 [then]

they sent [him] to Pelican Bay for more torture," (*id.*, at p. 2); that "at Delano a lady officer was

having sex with inmates and supplying them with drugs," (*id.*); that he "was in approximately 29

years counting Folsom's Administrative Segregation yard where the north and south [prison

gangs] were basically allowed to fight and stab each other on a daily basis," (*id.*); that "continued

food medicating . . . at Kern Valley has also lead (sic) to a fight between [Plaintiff] and an inmate

called Montes on July 28, 2018, when the C-1-Unit correctional staff allowed inmates to medicate

and serve meals unsupervised," (*id.*); that Defendants' argument that Plaintiff's symptoms are

related to his GERD is "Corcoran prison's abusive medical systems excuse to cover up official

malfeasance.  The hospital is full of officers working with medical staff.  They actually think its

(sic) funny" (*id.*); and that he was shot with a "40 mm canester (sic)" on July 28, 2018, because

he was fighting with an inmate who Plaintiff believes was medicating his meals, but the rule violation report did not indicate Plaintiff's reason for the fight and the officer who shot Plaintiff said she was aiming for the other inmate, (*id.*, at p. 3). These statements are too general and conclusory to prove or disprove any material fact which Plaintiff claims in this action. Because of their lack of specificity, Plaintiff also fails to establish that any of these statements are based on his personal knowledge of admissible evidence. Finally, Plaintiff is proceeding only on alleged medicating of his meals between August 13, 2015, and April 4, 2016, while Plaintiff was housed at CSP-Cor as stated in the First Amended Complaint. (*See* Docs. 26, 28, 76, 82.) Allegations beyond that time-period at different facilities are not relevant to this action.

Plaintiff also contends Defendants' motion should be denied because the Court found he stated cognizable claims and defense counsel's "questions of law has been addressed in earlier motions." (Doc. 104, p. 5.) While numerous motions have been filed and ruled on in this action, there has been no prior finding on the merits of Plaintiff's allegations against Defendants for summary judgment purposes. Plaintiff also contends defense counsel "makes a comparison of a couple of explainable issues" and that many of the defense "excuses are just insinuating issues." (*Id.*) However, as previously discussed, Defendants allegations are all supported by admissible evidence and Plaintiff fails to identify and produce evidence to negate any comparisons or insinuations which he believes are false.

Plaintiff has also failed to establish that he qualifies as an expert witness for the Court to accept his opinion that his ailments are due to the side-effects of antipsychotic medications he alleges were sprinkled surreptitiously on his meals instead of his acid reflux or other medical conditions. (*See* Fed. R. Evd. 702.) Since Plaintiff is a lay witness, the only admissible opinions he can render are limited to opinions that are rationally based on his perception; that are helpful to clearly understanding his testimony or to determining a fact in issue; and are not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 such as medical opinions. (*See* Fed. R. Evd. 701.) Thus, Plaintiff's statements in his opposition and the FAC are admissible only to establish what symptoms he had at a given time—they cannot be considered to show the medical cause of any of his symptoms.

The admissible parts of Plaintiff's declarations show various symptoms he has experienced—which he alleges were caused by the antipsychotic medications with which his meals were tainted. Plaintiff has no medical training for the Court to accept that antipsychotic medications caused his symptoms. Additionally, none of Plaintiff's statements are specific to the time-period at issue in this action or linked to any of the Defendants against whom Plaintiff proceeds. (*See* Doc. 104, pp. 2-5.) Plaintiff also fails to show that his statements regarding nurses giving medications to prison staff, or inmates hiding pills under their tongues while correctional staff distract the nurses distributing medications, are based on anything other than his sheer speculation. (*See* Doc. 104, pp. 3-5.)

Finally, although Plaintiff filed approximately one hundred sixteen pages of exhibits with his opposition, he does not refer to any specific page in the exhibits to support any of his arguments or contentions. Instead, at the end of his opposition, Plaintiff simply states "consider exhibits enclosed." (Doc. 104, p. 5.) A district court need only consider evidence which is brought to its attention in opposition to a motion for summary judgment. *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Court need not, and will not consider any affidavits, declarations, or other documents as evidence in support of an opposition unless the documents are specifically identified in an opposition brief, and it is shown what the documents are and where they came from, and accompanied by cites to the page and particular portions of the documents that allegedly oppose the motion with an explanation as to how each document supports the opposing arguments and allegations. "[A] district court is 'not required to comb the record to find some reason to deny a motion for summary judgment.'" *Id.* (quoting *Forsberg v. Pacific N.W. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Although a Court may consider materials that are not cited, *see* Federal Rule of Civil Procedure 56(c)(3), materials submitted that are not specifically cited to and accompanied with arguments explaining how the cited materials support a position, need not be considered. The Court is not required and declines to attempt to correlate Plaintiff's evidence with the facts he purports establish a dispute where Plaintiff has failed to do so. Fed. R. Civ. Pro. 56(c)(1).

//

Plaintiff fails to submit evidence to show that any of the Defendants surreptitiously placed antipsychotic medications in his food in violation of the Eighth Amendment or without a *Keyhea* order in violation of the Fourteenth Amendment. Accordingly, Defendants are entitled to summary judgment as Plaintiff fails to demonstrate "the existence of genuine issues for trial." *In re Oracle Corp.,* 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323).

## RECOMMENDATION

Based on the foregoing, the Court finds that Defendants have met their burden of showing that they did not tamper with Plaintiff's food in violation of the Eighth Amendment or without a *Keyhea* Order in violation of the Fourteenth Amendment Due Process Clause. Plaintiff has not established a factual dispute as to a material fact and Defendants' motion for summary judgment should be granted.

Accordingly, the Court **RECOMMENDS**:

    (1)   that Defendants Gonzales, J. Juarez, L. Lawrence, J. Medina, R. Mendoz, A. Podsakoff, and B. Stinger are entitled to judgment as a matter of law such that their motion for summary judgment, filed on January 25, 2019, (Doc. 101), should be **GRANTED**; and

    (2)   that the Clerk of the Court be directed to enter judgment against Plaintiff and for Defendants, and that this action be closed.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). **Within 21 days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **June 27, 2019**                     /s/ *Sheila K. Oberto*

UNITED STATES MAGISTRATE JUDGE